UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :
                                  :
V.                                : Case No. 3:14-CR-00031 (RNC)
                                  :
EDWARD THOMAS                     :
                                  :
                                  :

MEMORANDUM

Defendant Edward Thomas has moved to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment (ECF No. 36).  His motion has been denied in an oral ruling.  This memorandum provides a more complete statement of the reasons for the ruling.

I. Background

The following account is based on testimony given by FBI Special Agents Timothy Kobelia and James Wines at an evidentiary hearing held on October 28, 2014, which the Court credits.

This case arises out of an investigation in Connecticut into the trafficking and prostitution of a minor female from Oregon.  In October 2012, Agent Kobelia received an alert from the National Center for Missing and Exploited Children (NCMEC).  The alert concerned content posted on Backpage.com, a website used to advertise sexual services (among other things).  NCMEC had noticed an advertisement posted in the New Haven area that

1

appeared to depict a minor.[1]  The site listed her name as "Rain" and indicated that the advertisement had been posted by someone with the e-mail address "fireforpresident372@yahoo.com."

Two weeks later, in an effort to investigate the possibility that "Rain" was a minor, Kobelia called the number listed in the advertisement.  He learned that "Rain" was staying at the Howard Johnson hotel in Milford, Connecticut, and went there the following day to speak with a manager.  The manager recognized the photo of "Rain" from the Backpage ad and said he believed she was staying in one of two rooms rented to a person named Kayla Walters.[2]  Kobelia obtained Walters's driver's license photo.  It did not match the picture of "Rain" from the Backpage ad.

On November 8, 2012, NCMEC sent another alert to the FBI's New Haven office.  It requested that agents try to recover an endangered minor runaway (hereinafter referred to as Minor Victim, or "MV") from Portland, Oregon, thought to be prostituted near New Haven.  The alert contained a link to the Backpage advertisement for "Rain."  On receiving the alert, Agent Wines accessed Backpage to view "Rain's" content.  He noticed that "Rain's" advertisement appeared to be related to content advertising the sexual services of a woman calling herself

---

[1]Kobelia had viewed the ad himself prior to receiving the NCMEC alert.

[2]According to Kobelia, pimps operating out of hotels often rent two rooms near each other.

"Sunshine."  The two pages occurred in sequence (indicating that one was posted close in time to the other), each page listed a non-local phone number beginning with the same six digits, and the photograph of "Sunshine" appeared to depict Kayla Walters, the woman who had rented the two rooms at the Howard Johnson.

Federal agents, joined by Milford police officers, scrambled to respond.  Wines called "Rain's" listed number and arranged a "date" for ten o'clock that night.  The woman on the phone, who identified herself as "Rain," told the agent to call her when he arrived at the Howard Johnson so she could direct him to a particular room.

When the agents arrived at the Howard Johnson, Wines called the number for "Rain" and got no answer.  Wines called six or seven more times but received no response.  At 10:18 p.m., agents spoke with the hotel clerk and learned that, although Walters was not listed on the guest registry, a man named Edward Thomas had rented two rooms, 202 and 205.  They suspected that MV might be in one of them.[3]

The agents headed for the second floor.  On the way to the elevators they encountered Walters, who was walking with a man

_____

[3]Two other guests had also rented two rooms.  Kobelia testified that the hotel desk clerk had a passing familiarity with one of them.  Based on information from the clerk, the agents concluded that MV was not in either of the rooms rented by that person.  The agents could not rule out the other remaining guest but decided to check Thomas's rooms first.

later identified as Thomas.  Each smelled of marijuana smoke, and Thomas had a large wad of money protruding over the top of his jeans pocket.  The agents stopped them, brought them to the hotel lobby, and questioned them separately.  Both said they knew "Rain" and had seen her earlier in the day but did not know where she was.  Thomas said that he was "helping her out."  Walters told agents that she (Walters) was staying in Room 202 and did not mention 205.  The agents concluded that MV was probably in Room 205 and headed in that direction.

When they arrived, they saw that lights were on in the room and heard the sound of a television inside.  They knocked and identified themselves, but no one answered.  Concerned for MV's safety, they obtained a universal key at the front desk and entered the room.  There they found MV, unclothed and asleep on a bed.  Kobelia tried to wake her up.  She was "groggy" and "disoriented" at first, as if under the influence of drugs.  After a "few minutes," though, she was able to communicate "without difficulty."  The agents confirmed that MV was the girl from Oregon.  Because she was angry at their presence, they left her in the care of another officer and went back to the lobby.  Before leaving, they noticed a closed laptop bag resting on another bed.

When the agents arrived in the lobby, Walters and Thomas were still there.  Wines called the phone number associated with

"Sunshine's" Backpage advertisement.  A phone in the possession of Walters rang and Wines seized it, at which point Walters vomited into a trash can.  Wines tried to interview her, but she would not respond to his questions.  Wines then turned his attention to Thomas and asked about the money in Thomas's pocket.  Thomas said that it was about $4000 he had received from his nephew as part of a legal settlement.  Pressed for details about the settlement, Thomas was unable to provide any.  Reasoning that pimps often carry cash that customers use to pay for prostitution, Wines seized the money.[4]

The agents then returned to Room 205, intent on finding the phone listed in the "Rain" advertisement and arranging for MV to go to the hospital.  According to Wines, MV was "calmer" when he and Kobelia returned to the room.  She was wrapped only in a bedsheet, so Wines asked her to get dressed.  MV replied that her clothing was in Room 202.  She told the agents that she "stayed" in Room 202 and had regular access to that room.  Wines testified that MV had no trouble understanding the agents, and they had no trouble understanding her.

Around this time, Wines received an e-mail from a law enforcement officer in Oregon.  The e-mail relayed information indicating that MV had "come east" to "meet some pimp named 'Fire.'"

---

[4] About $3900 all told.

Kobelia and Wines went to Room 202 to retrieve MV's clothes. When they entered (using the universal key), they noticed a laptop on a nightstand.  It was open, revealing a screensaver that used the word "Fire."  The agents gathered MV's clothes and returned them to Room 205, but left MV's other belongings (including toiletries and other clothing) in Room 202.

The agents subsequently returned to Room 202 with MV to allow her to get her suitcase.[5]  There they seized the laptop computer with the "Fire" screensaver.  They proceeded to Room 205, where they picked up the laptop bag, decided that it probably contained a laptop, and seized it.  The agents reasoned that someone had used a computer to post the Backpage ads for MV's services, so the computer with the "Fire" screensaver and the one found in the room with MV probably contained evidence of trafficking.

The agents gathered the laptop bag, the laptop with the "Fire" screensaver, Walters's phone and the cash.  They went to the lobby, where they intended to inventory the evidence and give receipts to Thomas and Walters.  At this time, Wines learned that another officer had seized Thomas's Blackberry after he saw

---

[5]The agents had tried to find the suitcase during their first trip to Room 202.  But the room was messy, with several suitcases on the floor, and there was some confusion about which one belonged to MV.  She had described the item as a "pink" suitcase.  The agents had assumed MV was referring to its color, but in fact she was referring to its brand.

Thomas using it.  The officer gave the Blackberry to Wines.

Kobelia and Wines then inventoried the seized items.  Before the agents opened the laptop bag, Thomas asked them why they were taking his laptop and digital camera.  The agents told Thomas they were seizing the items as crime evidence and allowed him to remove some personal belongings from the bag.  The agents took the rest.  Neither Walters nor Thomas was arrested that evening.

In December 2012, the government obtained search warrants for the electronic devices seized from the Howard Johnson.  The laptops, the Blackberry and the digital camera contained explicit images of MV and Walters – some of which had been posted in the Backpage advertisements – along with other incriminating evidence.

Thomas was charged with one count of conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c), and two substantive counts of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b).  He has moved to suppress all the evidence collected from the items seized at the Howard Johnson on November 8, 2012: his Blackberry, the roll of cash in his pocket, the laptop and digital camera found in the laptop bag seized from Room 205, and the laptop with the "Fire" screensaver seized from Room 202.

II. Discussion

The Fourth Amendment to the United States Constitution

provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A search or seizure generally requires a warrant, but there are a number of exceptions to this rule.  Of relevance here, officers need not be armed with a warrant to search or seize if exigent circumstances are present, valid consent is given, or the plain view doctrine applies.

Thomas argues that the items seized at the Howard Johnson were obtained in violation of the Fourth Amendment and any evidence they provide must be excluded from the trial.  See Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961).  Whether the evidence should be excluded depends initially on the answers to four questions: 1) whether the agents had authority to enter Room 205 (where they observed the laptop bag, found MV, and sought consent to enter Room 202); 2) whether the agents had authority to enter Room 202 (where they found the laptop with the "Fire" screensaver); 3) whether the agents had authority to seize the electronic devices belonging to Thomas; and 4) whether the agents had authority to seize the money found in Thomas's pocket.

8

A. <u>Whether the Agents Had Authority To Enter Room 205</u>

When the agents entered Room 205, they effected a search of Thomas's hotel room.  Because they did so without a warrant, this intrusion is "presumptively unreasonable."  <u>United States v. Karo</u>, 468 U.S. 705, 717, 104 S. Ct. 3296, 82 L.Ed.2d 530 (1984).

The government urges that the agents' actions were reasonable because of exigent circumstances.  Police may effect a search or seizure without obtaining a warrant "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  <u>Mincey v. Arizona</u>, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L.Ed.2d 290 (1978).  The need to protect a dwelling's occupant from imminent injury is an exigency justifying entry into the dwelling, and the defendant concedes that "the potential sexual exploitation of a minor is an exigent circumstance."  ECF No. 37, at 10 (quoting <u>United States v. Gilliam</u>, No. 11 Crim. 1083, 2012 WL 4044632, at *2 (S.D.N.Y. Sept. 12, 2012)).  The only question is whether, in all the circumstances, the facts known to the entering agents provided "an objectively reasonable basis" to conclude that MV was inside Room 205 and in need of help.  <u>See Brigham City, Utah v. Stewart</u>, 547 U.S. 398, 399, 126 S. Ct. 1943, 164 L.Ed.2d 650 (2006).

I think it is plain that they did.  When Kobelia and Wines entered Room 205, they knew from Backpage and from the phone call

to MV that she was working as a prostitute and operating out of the Howard Johnson.  NCMEC had notified the agents that MV was a minor who had left home to work for a pimp in New Haven.  Kobelia and Wines had connected MV to Walters by ascertaining that MV had stayed in a room rented to Walters in October and through viewing the Backpage advertisements for "Rain" and "Sunshine."  They had connected Walters to Thomas because the two were walking together in the Howard Johnson.  The agents knew that Thomas was renting two rooms on November 8, and they knew from their training and experience that pimps often use two rooms in connection with a prostitution operation.  Both Walters and Thomas admitted to knowing MV but claimed not to know where she was.  Finally, Walters told the agents that she had rented Room 202 but did not mention Room 205 – an omission suggesting that MV might be located there – and the lights and television were on in Room 205, indicating that at least one person was inside.

In the context of these facts, it was reasonable for the agents to conclude that MV was in Room 205 and might be in imminent danger of sexual assault.[6]  The facts in this case are quite similar to those in <u>United States v. King</u>, 560 F. Supp. 2d

---

[6]The government also argues that, even if it was not reasonable for the agents to conclude that MV might be inside Room 205 with a customer, entry was justified to prevent her from being exposed to "repeated sexual contact" in the future. Because I think it was reasonable for the agents to conclude that MV might have been with a customer, I need not reach this question.

906 (N.D. Cal. 2008), in which the court held that officers were justified in entering a hotel room from which a minor was working as a prostitute.  In King, agents had developed suspicion about a trafficking operation when they viewed a young girl's advertisement for sexual services on Craigslist.  A phone call led them to the hotel where she was working, where officers took her pimp into custody and knocked on her door.  King, 560 F. Supp. 2d at 911.  When the minor answered their knock, the officers entered her room without obtaining consent.  In the room they found evidence of prostitution.  The court held that exigent circumstances justified the officers' entry.  At the time they entered the room, "the officers did not know whether a customer or pimp was still in the room."  Id. at 916.  Because a customer or pimp might well be in the room, it was reasonable to access the room without consent to protect the minor against a sexual assault.

So too here.  The defendant tries to distinguish King on the ground that in that case, officers were certain the minor was present in her hotel room.  Here, "law enforcement did not know if the individual for whom they were searching was in either room, or indeed if she was present in the hotel at all."  ECF No. 37, at 10.  Moreover, he argues, the police should have known that MV was not engaged with a customer at the time they entered the room, because she had made a "date" with the agents for ten

o'clock and presumably had not booked another for the same time. Id.

Neither argument is persuasive.  It is true that in a strict sense, the officers did not *know* that MV was in Room 205.  But the Fourth Amendment never demands certainty as a quantum of suspicion, and in the context of emergency-aid searches it demands only "an objectively reasonable basis" for belief. Brigham City, 547 U.S. at 399.  MV's Backpage ad said she was at the Howard Johnson, she confirmed her location over the phone, and Walters's failure to mention Room 205 suggested that MV was operating out of that room.  And though it is true that MV had made a "date" with an agent for ten o'clock, she did not answer her phone at that time and did not respond when agents knocked on her door even though the lights and the television were on.  In those circumstances it was reasonable for the agents to conclude that MV was with a customer in Room 205.  Accordingly, they had authority to enter.

B. Whether the Agents Had Authority To Enter Room 202

The government advances three arguments to justify the agents' entry into Room 202.  First, it argues (though only in a footnote) that their entry "may not be a 'search' for Fourth Amendment purposes."  ECF No. 41, at 23 n.7.  Second, it contends that the entry was justified by exigent circumstances: officers had to get MV's clothes.  Its third argument is that MV had

12

either actual or apparent authority to consent to the search.  On this last ground I agree with the government, so I need not reach its other arguments.

The question whether MV gave valid consent to the search of Room 202 implicates two issues.  The first is whether, as a third party, she had actual or apparent authority to permit the search. The second is whether her intoxication rendered her consent invalid.  I conclude that MV had both actual and apparent authority to consent to the search of Room 202 and that her consent was voluntarily given.

1. Actual or Apparent Authority

A third party may consent to a search of an area in which another person has a reasonable expectation of privacy if the third party shares common authority over the area.  In the Second Circuit, a third party's consent is valid if that party has access to the area to be searched, and 1) common authority over the area; 2) a substantial interest in the area; or 3) permission to gain access to the area.  United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992).  Moreover, even if a third party lacks actual authority to consent to a search, she has apparent authority and the search is permissible if, in all the circumstances, it is reasonable for officers to conclude that she has actual authority.  Factors relevant to this determination include "'1) possession of a key to the premises; 2) a person's admission that

13

she lives at the residence in question; 3) possession of a
driver's license listing the residence as the driver's legal
address; 4) receiving mail and bills at that residence; 5)
keeping clothing at the residence; 6) having one's children
reside at that address; 7) keeping personal belongings such as a
diary or a pet at that residence; 8) performing household chores
at that residence; 9) being on the lease for the premises and /
or paying rent; and 10) being allowed into the residence when the
owner is not present.'" Moore v. Adreno, 505 F.3d 203, 209 n.6
(2d Cir. 2007) (quoting United States v. Groves, 470 F.3d 311,
319 (7th Cir. 2006)).

        In support of his motion to suppress, the defendant points
out that Room 202 was registered in his name only and MV did not
possess a key.  Indeed, he argues, MV's lack of a key indicates
that he "specifically guarded against [the] possibility" that she
would permit someone to search the room.

        The government responds that MV had actual authority to
consent to the search because she kept her clothing and other
belongings in Room 202, "stayed" in the room, and had "regular
access" to it.  ECF No. 41, at 25.  And even if MV lacked actual
authority, it argues, it would reasonably have appeared otherwise
to the agents.  They knew that MV, Walters, and Thomas had been
staying at the Howard Johnson since October 25 (at the latest),
and MV told them that she had "regular access" to the room,

"stayed" in it, and kept her clothing and other belongings there.

MV's lack of a key and the absence of her name from the guest registry do not settle this point in the defendant's favor. The Second Circuit takes a nuanced view of third party consent questions, directing district courts to look to context and circumstance rather than simply tallying up factors. United States v. McGee, 564 F.3d 136 (2d Cir. 2009), is an example. In that case, a woman who lived with her boyfriend tried to move out. She packed her bags and left his house. McGee, 564 F.3d at 137. The boyfriend, intending to stop her, grabbed her bags, put them inside the house and locked her out. She called the police to help her get back in. When an officer arrived she gave him permission to search the house; he did so and found crime evidence. The defendant argued that the girlfriend, who was trying to move out and had been locked out of the house, lacked authority to consent to the search. Id. at 139.

The Second Circuit disagreed. The defendant, it wrote, oversimplified the matter by harping on his intention to prevent the girlfriend from entering the home. The case turned not on the mere fact of the locked door, but the meaning of the locked door:

> By locking the door, [the defendant] was not saying, 'Get out of my house and stay out.' To the contrary, [the defendant] locked her bags in the house and locked her out temporarily in an effort to prevent her from leaving the house. Far from seeking to expel her from the house, his conduct was designed to insure that she

15

would continue to reside in it.

Id. at 141.  McGee makes plain that MV's lack of a key (and the absence of her name from the guest registry) does not dictate a ruling in favor of the defendant.

Consistent with McGee, I find that MV had actual and apparent authority to consent to the search of Room 202.  That her name was not on the registration counts for little.  MV was a minor victim of sex trafficking, and the absence of her name from the hotel's books says more about the illegality of Thomas's operation than it says about MV's relationship to the property in issue: of course Thomas would not register the room in her name. As for the key, it is true that MV lacked one at the time the agents found her, and this suggests she was not able to come and go with absolute freedom.  But it is unsurprising that Thomas would choose to prevent his victim from moving about the hotel with perfect liberty.  MV's lack of a key reveals much about her relationship with Thomas, but little about her relationship with Room 202.  See United States v. McAlpine, 919 F.2d 1461, 1464 (10th Cir. 1990) (what matters in a third party consent case is the relationship "between the consenter and the property searched, not the relationship between the consenter and the defendant").  In the circumstances, her lack of a key is less significant than it might be in a different context.

Of much greater significance was the presence of MV's

16

clothing and belongings in Room 202.  The agents found nothing in
Room 205 except MV and a laptop bag.  Given the particulars of
the trafficking operation (which were known to the agents at that
time), they could reasonably infer that Room 205 was where MV
engaged in prostitution and Room 202 was where she resided.  MV
confirmed this by telling Kobelia and Wines that she "stayed" in
Room 202.  What is more, she had been living in one Howard
Johnson room or another since October 25 at the latest (which is
when Kobelia first went to the hotel to inquire of the manager).[7]
See United States v. Jones, 580 F.3d 785, 787 (5th Cir. 1978)
(holding that a third party who had been a guest in the
defendant's home for eight days had actual authority to consent
to a search of common areas).  This indicates that MV had access
to the room and a substantial interest in it.  Moreover, the
agents, who were privy to this information at the time of the
search, were reasonable in concluding that she had authority to
consent.  MV therefore had both actual and apparent authority to
permit the agents to enter Room 202.

2. Voluntariness

     The second question regarding consent is whether MV's age
and mental state rendered her consent invalid.  An individual's
"age and mental ability," as well as "whether the individual was

---

     [7]It is not clear whether MV lived in Room 202 for the entire
two week period.

intoxicated or under the influence of drugs," are relevant in
determining whether, in all the circumstances, consent was
voluntary.  United States v. Dunning, 666 F.3d 1158, 1165 (8th
Cir. 2012).  The government bears the burden of proving
voluntariness by a preponderance of the evidence, United States
v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997), and "the ultimate
question presented is whether the officer had a reasonable basis
for believing there had been consent to the search," United
States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) (internal
quotation marks omitted).

On the facts presented here, I conclude that MV validly
consented to the search of Room 202.  The defendant places great
weight on Kobelia's representation that MV was in a "drug-induced
stupor" when he first entered Room 205.  But MV was lucid at the
time she gave consent.  Kobelia testified that "a few minutes" or
"moments" after waking up, MV was able to communicate "without
difficulty."  She was able to understand who the agents were and
why they were there, and she was able to communicate her
displeasure at their arrival.[8]  Moreover, the agents did not
obtain consent to search Room 202 during their first trip to Room
205.  Rather, they left MV in the care of another officer, went
back to the lobby and interviewed the defendant.  They did not

---

[8]When Wines told MV that he had been in communication with
an Oregon law enforcement agent known to MV, she replied, "Fuck
her and fuck you."

18

return to Room 205 until some ten minutes later, thus providing

MV additional time to regain her senses.  They asked MV to get

dressed and she said all her clothing was in Room 202.  <u>See</u>

<u>United States v. Willie</u>, 462 F.3d 892, 896 (8th Cir. 2006)

(defendant's consent to search a hotel room was valid in part

because he "responded to [police] questioning" and was able to

tell police the number of his hotel room).  Wines testified that

during this exchange, he was able to understand MV and she was

able to understand the agents.  I therefore conclude that at the

time MV gave consent, she did so voluntarily.[9]

C. <u>The Blackberry, the Laptop with the "Fire" Screensaver and the</u>
<u>Laptop Bag</u>[10]

---

[9]The defendant also argues that MV was unable to consent
because, as a minor, she would have been unable to rent Room 202
herself.  It is true that her age is relevant in the calculus of
voluntariness, but only to the extent that it actually bore on
the exercise of her will; her ability to rent a room is
irrelevant.  <u>See United States v. Gutierrez-Hermosillo</u>, 142 F.3d
1225, 1231 (10th Cir. 1998) (holding that a fourteen-year-old
girl voluntarily consented to a search of her father's hotel
room).  As discussed above, MV was able to and did authorize the
agents to search Room 202.

[10]The laptop bag yielded a digital camera and a laptop
containing incriminating evidence.  The defendant does not appear
to argue that the process by which the laptop and the digital
camera were found in the bag was not a valid inventory search.
His argument focuses on the seizure of the bag itself.  The
defendant asserts it was "pure speculation" for officers to
conclude on sight that the bag contained a computer – it might
have, he argues, contained "books, papers, Bibles, [or] take out
food" – but it is not at all speculative to infer that a laptop
bag contains a laptop.  <u>See United States v. Smith</u>, No. S1-4:11
Crim. 288 (RWS), 2012 WL 1309249, at *7 (E.D. Mo. Mar. 13, 2012)
("[The officers] could seize the bag . . . because . . . it
likely contained evidence of a crime in the form of a laptop

These electronic items can be considered together.  As discussed, the agents were lawfully present in Room 205 when they viewed the laptop bag,[11] and they were lawfully present in Room 202 when they viewed the laptop with the "Fire" screensaver.  The defendant appears to concede that the officers viewed his Blackberry in the course of a valid <u>Terry</u> stop.  ECF No. 37, at 8.  The question, then, is whether these seizures can be justified under the plain view doctrine or as necessary measures to prevent the destruction of evidence.  The plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  <u>Illinois v. Andreas</u>, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L.Ed.2d 1003

---

computer.") Because it was reasonable for officers to infer that the laptop bag contained the item it was designed to contain, the bag can be treated identically to the Blackberry and the other computer in the analysis that follows.

[11]The government's memorandum seems to suggest that in determining the legality of the seizure of the laptop bag, it is permissible to consider the information the agents gleaned when they picked it up (namely, that it felt like it contained a laptop).  Whether moving an object for closer inspection intrudes on a reasonable expectation of privacy and thus constitutes a search depends on the facts.  <u>See Arizona v. Hicks</u>, 480 U.S. 321, 324–25, 107 S. Ct. 1149, 94 L.Ed.2d 347 (1987).  Even assuming lifting the bag was a search, the agents' action was reasonable under the plain view doctrine.  In the circumstances, it was reasonable for the agents to infer that the laptop bag probably contained a laptop before they even lifted the bag.  This reasonable inference justified seizing the bag as evidence of crime.

(1983).  And if officers reasonably suspect that crime evidence
will be lost or destroyed before they obtain a warrant, they may
effect a seizure if it is supported by probable cause.  Illinois
v. McArthur, 531 U.S. 326, 333, 121 S. Ct. 946, 148 L.Ed.2d 838
(2001).

Here, the agents seized three electronic devices, searching
none until they later procured warrants for each.  All three
seizures were justified under the plain view doctrine and to
prevent spoliation of evidence.

With regard to the plain view doctrine, it is true that an
electronic device is not a gun, a knife, or a bag of drugs –
classic examples of articles that are obviously incriminating.
But electronic devices may be seized under the plain view
doctrine when officers have cause to believe that the crime under
investigation was committed with the aid of a computer.  In
United States v. Agbodjan, 871 F. Supp. 2d 95 (N.D.N.Y. 2012),
for example, the court permitted the plain view seizure of the
defendant's laptop because, "although [it was] an everyday item,
[agents] knew that a computer had been used in the reshipping
scam."  Agbodjan, 871 F. Supp. 2d at 101, aff'd, 303 Fed. Appx.
948 (2d Cir. 2008).  Moreover, the court held, it was appropriate
for officers to seize the defendant's iPhone and Blackberry,
because these "electronic devices are used interchangeably with
computers and are valued for their portability."  Id.  United

States v. Reyes, No. 3:06 Crim. 120 (SRU), 2007 WL 419636 (D. Conn. Jan. 30, 2007) recognizes the same principle: "[T]he cellular telephones plainly fell within the [plain view] standard.  It was immediately apparent to Agent Perez, a trained DEA agent with over ten years of law enforcement experience, that cellular telephones contain caller logs, text messages, phone books and other information that would be highly relevant to a drug prosecution . . . ."  Reyes, 2007 WL 419636, at *6.  See also United States v. Delva, No. 12 Crim. 802 (KBF), 2014 WL 1378770, at *6-7 (S.D.N.Y. Mar. 11, 2014) ("Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phone may contain contacts and other evidence of a crime.").

Here, the agents had ample evidence to conclude that the Blackberry and both laptops had been used in aid of Thomas's crime.  They knew that someone had used a computer or a smartphone to create the Backpage content advertising MV's services.  They knew that Thomas (on whose person they found the Blackberry) was connected to MV because of his own admissions, his rental of Rooms 202 and 205, his association with Walters, and his nickname, "Fire."  They knew that Room 202, in which the second laptop was found, contained MV's personal belongings and clothes, and they found the laptop bag on a bed next to MV.  Each electronic device was therefore connected to MV and to Thomas.

22

Moreover, the agents knew from viewing the Backpage site that someone had used a camera or a smartphone to take photographs of MV.  Their training and experience led them to conclude that the photographic files were probably stored on a computer, a phone, or both.  These facts rendered it so likely that the laptops and the Blackberry contained evidence of Thomas's criminal activity that the incriminating nature of the devices was "immediately apparent" within the meaning of the plain view doctrine.

The defendant has little case law to the contrary.  He relies on United States v. Byan, No. 12 Crim. 586 (RJD), 2013 WL 4459002 (E.D.N.Y. Aug. 15, 2013), in which the court disallowed the seizure of a cell phone and wrote, "[p]ermitting any and all electronics to be seized without a warrant merely because a defendant used the Internet or the telephone at some point would impermissibly open the door routinely to warrantless seizures of electronics in almost any criminal investigation."  Byan, 2013 WL 4459002, at *4.  But the case is easily distinguishable.  In Byan, the defendant was suspected of armed robbery, and officers seized his phone "based on mere speculation that [it] may contain evidence because the robbers used the Internet at some point to buy masks."  Id. at *3.  In this case, the Backpage ads provided a much stronger basis to conclude that the devices had been used in aid of a crime.

Thomas also cites Riley v. California, 134 S. Ct. 2473

23

(2014), for the proposition that personal electronic devices
generally, and cell phones particularly, tend to contain lots of
private information and deserve strong Fourth Amendment
protection.  It is true that Riley acknowledges this point, but
the case undermines the defendant's argument.  In Riley, one
defendant had been arrested on suspicion of selling drugs.  The
other had been arrested for possessing firearms, and a search
incident to arrest turned up evidence that he was in a gang.
Though the Court ultimately disallowed on-scene searches of the
defendants' cell phones, it also noted that officers could have
seized the phones and later obtained warrants to search them.
See Riley, 134 S. Ct. at 2486 ("Both Riley and Wurie concede that
officers could have seized and secured their cell phones to
prevent destruction of evidence while seeking a warrant.  That is
a sensible concession [citing cases].").

Turning to the government's destruction-of-evidence
argument, it easily holds up in light of my conclusion that there
was probable cause to believe that the Blackberry, the laptop and
the laptop bag contained evidence of criminal activity.  It
requires only the additional ingredient of reasonable cause to
think that the evidence might have been destroyed if it had not
been seized, and the case law seems universally to acknowledge

24

that electronic evidence is transitory and easily deleted.[12]  See
id.; United States v. Walser, 275 F.3d 981, 985 (10th Cir. 2001)
("The other concern relative to conducting such computer searches
lies in the fact that computer evidence is vulnerable to
tampering or destruction.").  I do not understand the defendant
to dispute this point.

D. The Money

     The government argues that the seizure of $3900 from the
defendant's person was justified under the plain view doctrine.
I agree.

     The defendant resists the government's argument with the
assertion that "[t]he cash was simply cash."  ECF No. 37, at 8.
But the cash was not simply cash.  The cash was $3900 in bills
tucked into the jeans pocket of a man who 1) was in the company
of a woman, Walters, who advertised her sexual services on the
internet; 2) had rented a hotel room in which agents had just
found a victim of a sex trafficking operation; and 3) could not
offer a plausible account of how he came into the money.  On
these facts, the officers were justified in concluding that the
cash was evidence of criminal activity.  See United States v.
Cervantes, 19 F.3d 1151, 1153 (7th Cir. 1994) ("[A]lthough a wad

---

     [12]Wines's testimony provides further support for the
conclusion that the agents risked losing evidence if they did not
seize these items: he testified that an officer seized Thomas's
Blackberry after he saw Thomas using it and suspected that Thomas
might be communicating with confederates or deleting evidence.

of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs *is* suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity . . . .").

III. <u>Conclusion</u>

Accordingly, the defendant's motion to suppress has been denied.

So ordered this 13th day of January 2015.


<u>            /s/            </u>
Robert N. Chatigny
United States District Judge

26